# Supreme Court of Florida

_____

No. SC12-644
_____

**RICHARD MASONE,**
Petitioner,

vs.

**CITY OF AVENTURA,**
Respondent.

_____

No. SC12-1471
_____

**CITY OF ORLANDO, FLORIDA,**
Petitioner,

vs.

**MICHAEL UDOWYCHENKO, etc., et al.,**
Respondents.

[June 12, 2014]
**<u>CORRECTED OPINION</u>**

CANADY, J.

In these consolidated cases, we consider whether municipal ordinances imposing penalties for red light violations detected by devices using cameras were invalid because they were preempted by state law. At issue in these cases is the

operation of ordinances prior to July 1, 2010, the effective date of the Mark Wandall Traffic Safety Act, ch. 2010-80, Laws of Fla., which authorized—subject to statutory requirements—the use of red light traffic infraction detectors by local governments and the Florida Department of Highway Safety and Motor Vehicles.

In City of Aventura v. Masone, 89 So. 3d 233, 234 (Fla. 3d DCA 2011), the Third District Court of Appeal held that Aventura's ordinance was a valid exercise of municipal power under section 316.008(1)(w), Florida Statutes (2008), which specifically grants "local authorities, with respect to streets and highways under their jurisdiction and within the reasonable exercise of the police power," authority for "[r]egulating, restricting, or monitoring traffic by security devices or personnel on public streets and highways." The Fifth District Court of Appeal reached a contrary conclusion in City of Orlando v. Udowychenko, 98 So. 3d 589, 591 (Fla. 5th DCA 2012), holding that Orlando's ordinance was invalid because it was in conflict with state law and was both expressly and impliedly preempted by state law. The Fifth District ruled that the imposition of penalties other than those specifically provided for by state statute "for running a red light in a particular municipality does not fall within the specific authority of section 316.008(1)(w)[,]" Florida Statutes (2008), which the court concluded "appears to contemplate only unique situations for which a statewide law is lacking or is inadequate." Id. at 599. The Fifth District certified conflict with the decision in City of Aventura. Id.

The losing party in each of these cases sought review, and we determined to exercise our jurisdiction. See art. V, § 3(b)(3)-(4), Fla. Const. For the reasons we explain, we agree with the Fifth District and conclude that the ordinances are not valid.

**I.**

In arguing that the respective ordinances are valid, both Aventura and Orlando rely on the specific power provided to local authorities by section 316.008(1)(w) for "[r]egulating, restricting, or monitoring traffic by security devices." Udowychenko and Masone, who challenged the validity of the ordinances in order to set aside fines imposed under the ordinances, contend that section 316.008(1)(w) does not authorize the municipal enforcement regime adopted by the ordinances, an enforcement regime that they contend is at odds in multiple ways with the enforcement regime adopted by state law.

As is clear from the arguments presented by the parties, the crux of these consolidated cases is whether section 316.008(1)(w) provides authority for the ordinances. In explaining our conclusion that the ordinances are not justified by this statutory provision, we will first briefly discuss the general relationship between state law and municipal ordinances. We will then review the statutory framework—found in chapters 316 and 318, Florida Statutes—relating to traffic

control and the disposition of traffic infractions, as well as the basic regime established by the ordinances.

## II.

## A.

"In Florida, a municipality is given broad authority to enact ordinances under its municipal home rule powers." City of Hollywood  v. Mulligan, 934 So. 2d 1238, 1243 (Fla. 2006).  But municipal ordinances must yield to state statutes. Article VIII, section 2(b), Florida Constitution, specifically recognizes the power of municipalities "to conduct municipal government, perform municipal functions and render municipal services," and it specifically recognizes that municipalities "may exercise any power for municipal purposes except as otherwise provided by law."  (Emphasis added.)  See also § 166.021, Fla. Stat. (2008) (relating to the exercise of municipal powers).  "The critical phrase of article VIII, section 2(b)— 'except as otherwise provided by law'—establishes the constitutional superiority of the Legislature's power over municipal power." City of Palm Bay v. Wells Fargo Bank, N.A., 114 So. 3d 924, 928 (Fla. 2013).

Preemption of local ordinances by state law may, of course, be accomplished by express preemption—that is, by a statutory provision stating that a particular subject is preempted by state law or that local ordinances on a particular subject are precluded.  Preemption by state law, however, "need not be explicit so long as

it is clear that the legislature has clearly preempted local regulation of the subject." Barragan v. City of Miami, 545 So. 2d 252, 254 (Fla. 1989). "Implied preemption is found where the state legislative scheme of regulation is pervasive and the local legislation would present the danger of conflict with that pervasive regulatory scheme." Sarasota Alliance for Fair Elections, Inc. v. Browning, 28 So. 3d 880, 886 (Fla. 2010). Even "where concurrent state and municipal regulation is permitted because the state has not preemptively occupied a regulatory field, 'a municipality's concurrent legislation must not conflict with state law.' " City of Palm Bay, 114 So. 3d at 928 (quoting Thomas v. State, 614 So. 2d 468, 470 (Fla. 1993)). "Such 'conflict preemption' comes into play 'where the local enactment irreconcilably conflicts with or stands as an obstacle to the execution of the full purposes of the statute.' " Id. (quoting 5 McQuillin Mun. Corp. § 15:16 (3d ed. 2012)).

**B.**

Chapter 316, Florida Statutes (2008), the Florida Uniform Traffic Control Law, contains a detailed code regulating traffic throughout the state. Chapter 316 contains two broad preemption provisions. The first provision, which both states a legislative purpose of uniformity and recognizes the need for municipalities to "control certain traffic movement or parking in their respective jurisdictions," is found in section 316.002:

It is the legislative intent in the adoption of this chapter to make <u>uniform traffic laws</u> to apply throughout the state and its several counties and <u>uniform traffic ordinances</u> to apply in all municipalities. The Legislature recognizes that there are conditions which require municipalities to pass certain other traffic ordinances in regulation of municipal traffic that are not required to regulate the movement of traffic outside of such municipalities. Section 316.008 enumerates the area within which <u>municipalities may control certain traffic movement or parking in their respective jurisdictions</u>. This section shall be supplemental to the other laws or ordinances of this chapter and not in conflict therewith. <u>It is unlawful for any local authority to pass or to attempt to enforce any ordinance in conflict with the provisions of this chapter</u>.

(Emphasis added.)

The second preemption provision is found in section 316.007, which provides in pertinent part: "The provisions of this chapter shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein, and <u>no local authority shall enact or enforce any ordinance on a matter covered by this chapter unless expressly authorized</u>." (Emphasis added.)

As indicated in section 316.002, section 316.008 contains an enumeration of specific powers that local authorities may exercise to control traffic movement or parking in their respective jurisdictions "within the reasonable exercise of the police power." Section 316.008(1)(w)—the crucial provision at issue here—provides that local authorities are not precluded from "[r]egulating, restricting, or <u>monitoring traffic by security devices</u> or personnel on public streets and highways,

- 6 -

whether by public or private parties and providing for the construction and maintenance of such streets and highways."  (Emphasis added.)

Chapter 316, of course, regulates red light violations.  Section 316.075 contains detailed rules governing the conduct of drivers and pedestrians relating to traffic control signal devices.  Among these rules is the general requirement that "[v]ehicular traffic facing a steady red signal shall stop before entering the crosswalk on the near side of the intersection or, if none, then before entering the intersection and shall remain standing until a green indication is shown."  § 316.075(1)(c)1., Fla. Stat. (2008).  Any violation of the rules in section 316.075 relating to traffic control signal devices "is a noncriminal traffic infraction, punishable pursuant to chapter 318."  § 316.075(4), Fla. Stat. (2008).

Chapter 318, Florida Statutes (2008), the Florida Uniform Disposition of Traffic Infractions Act, states that its purpose is to facilitate "the implementation of a more uniform and expeditious system for the disposition of traffic infractions."  § 318.12, Fla. Stat. (2008).  The chapter sets forth detailed requirements governing the handling of traffic infractions, including rules governing the proceedings for the adjudication of infractions, section 318.14; the amount of penalties, section 318.18; and the disposition of civil penalties, section 318.21.  Chapter 318 also contains a preemption provision regarding fines and other charges, which is set forth in section 318.121: "Notwithstanding any general or special law, or

municipal or county ordinance, <u>additional fees, fines, surcharges, or costs</u> other than the court costs and surcharges assessed under s. 318.18(11), (13), and (18) <u>may not be added to the civil traffic penalties assessed in this chapter</u>." (Emphasis added.)

**C.**

The Fifth District described Orlando's ordinance as follows: "According to the ordinance, if a vehicle is videotaped running a red light, an infraction is issued to the owner, wherein the owner is required to pay the fine for the infraction or file an appeal. If timely appealed, a hearing is set." <u>City of Orlando</u>, 98 So. 3d at 591. Infractions are issued to a vehicle's owner "[u]pon a code enforcement officer viewing the video and confirming ownership of the vehicle." <u>Id.</u> The process under Aventura's ordinance is not materially different. <u>See</u> <u>City of Aventura</u>, 89 So. 3d at 238-39. Each of the ordinances creates a municipal code enforcement system for the disposition of red light violations that is entirely separate from the enforcement system established under chapters 316 and 318. <u>See</u> <u>City of Orlando</u>, 98 So. 3d at 592-93; <u>City of Aventura</u>, 89 So. 3d at 240.

**III.**

Chapter 316 could not be clearer in providing that local ordinances on "a matter covered by" the chapter are preempted unless an ordinance is "expressly authorized" by the statute. § 316.007, Fla. Stat. (2008). It is undisputed that the

Orlando and Aventura ordinances—in providing for the punishment of red light violations—relate to matters "covered by" chapter 316. The ordinances consequently can be sustained as a valid exercise of municipal authority only if they are—as the express preemption provision of section 316.007 requires— expressly authorized by statute. Orlando and Aventura only point to section 316.008(1)(w) as the source of such an express authorization. That provision, however, is not equal to the task.

The Orlando and Aventura ordinances establish a regime for the punishment of red light violations that is distinct from the statutory regime for the punishment of such violations. Section 316.008(1)(w)'s grant of authority for "[r]egulating, restricting, or monitoring traffic by security devices" does not, however, explicitly provide authority for local governments to adopt measures for the punishment of conduct that is already subject to punishment under the framework established by chapters 316 and 318. As broadly described in section 316.002, the powers granted to municipalities by section 316.008 are powers by which "municipalities may control certain traffic movement or parking in their respective jurisdictions." "Control[ling] certain traffic movement" through "[r]egulating, restricting, or monitoring traffic by security devices" does not specifically encompass undertaking enforcement measures—that is, imposing punishment—outside the framework established by chapters 316 and 318 for conduct that is proscribed by

chapter 316 and subject to punishment under chapter 318.  Certain provisions of section 316.008 do grant express authority to local authorities to adopt additional measures with respect to the punishment of violations.  See §§ 316.008(4), 316.008(5), Fla. Stat. (2008).  But section 316.008(1)(w) is silent with respect to the punishment of violations.

Contrary to the dissent, our decision in Thomas v. State, 614 So. 2d 468 (Fla. 1993), does not support the reliance of Orlando and Aventura on section 316.008(1)(w) to escape the sweep of the express preemption provisions of chapter 316 and chapter 318.  Thomas dealt with a local ordinance adopted under the authority granted to local governments by section 316.008(1)(h) for "[r]egulating the operation of bicycles."  Id. at 469-70.  The ordinance, which imposed criminal penalties for violations, required bicycles to be equipped with a bell or gong.  Id. at 469.  No similar requirement regulating bicycles was contained in chapter 316.  The ordinance at issue in Thomas—unlike the ordinances at issue here—regulated specific conduct that was not subject to statutory regulation.  Thomas thus dealt with an ordinance on specific matters not "covered by" chapter 316.  § 316.007, Fla. Stat.

The question at issue in Thomas was the validity of a search incident to an arrest for a violation of the ordinance.  In determining that a custodial arrest for an ordinance violation was invalid, the Court held that the criminal penalty imposed

- 10 -

by the ordinance was "in conflict with state law" because the Legislature had "determined that traffic violations, including those relating to bicycles, should be punished by civil penalties." Id. at 470. Beyond its conclusion "that the city may not punish by criminal penalties conduct that the state has decriminalized," the Court declined to address "what types of penalties [the Legislature] intended to allow municipalities to impose for municipal ordinance violations." Id. at 473. Thomas does contain the statement that "[w]hile a municipality may provide a penalty less severe than that imposed by a state statute, an ordinance penalty may not exceed the penalty imposed by the state." Id. at 470. But that statement is in the context of the Court's general discussion of municipal authority to "legislate concurrently in areas that are not expressly preempted by the State." Id. It has no application where express preemption is operative. The reasoning of Thomas, therefore, does not support the conclusion that section 316.008(1) grants local governments the authority to establish code enforcement regimes for the punishment of specific conduct that is already proscribed and subject to punishment under state law.

The prohibition and punishment of red light violations are matters "covered by" chapter 316, and section 316.008(1)(w) does not "expressly authorize[]" local ordinances on those matters. § 316.007, Fla. Stat. (2008). The Orlando and Aventura ordinances therefore are expressly preempted by state law. Nothing in

section 316.008(1)(w) provides that municipalities are granted the authority to enact an enforcement regime different from the enforcement regime applicable under the provision of section 316.075(4) that red light violations are "punishable pursuant to chapter 318." And nothing in section 316.008(1)(w) creates an exception from the express preemption imposed by section 318.121 of any fines other than the penalties imposed as provided in chapter 318.

**IV.**

The Orlando and Aventura ordinances are invalid because they are expressly preempted by state law. We therefore quash the decision of the Third District in City of Aventura and approve the decision of the Fifth District in City of Orlando.

It is so ordered.

POLSTON, C.J., and LEWIS, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., dissenting.

I dissent because I conclude that, prior to 2010, the Legislature did not expressly preempt the use of red light cameras to the state. In fact, through the Florida Uniform Traffic Control Law, the Legislature actually authorized municipalities to enact municipal ordinances utilizing red light cameras to regulate traffic within their municipal boundaries. Further, these ordinances were not

- 12 -

impliedly preempted by, or in conflict with, state law, as the ordinances did not

affect the continued enforcement of the Florida Uniform Traffic Control Law and

did not allow for the imposition of a municipal citation when a motorist received a

red light infraction citation pursuant to state law.

Not until 2010 did the Legislature make clear through an express statement

in the Mark Wandall Traffic Safety Act that "[r]egulation of the use of cameras for

enforcing the provisions of this chapter is expressly preempted to the state."[1]  Mark

Wandall Traffic Safety Act, ch. 2010-80, § 3, Laws of Fla.  This new law

authorized municipal governments to use cameras to enforce red light violations

under the Florida Uniform Traffic Control Law and set forth a uniform system of

procedures and fines for municipalities to follow when utilizing these cameras.

See id.

Prior to the passage of that Act, however, the Legislature had already

granted municipalities such as Orlando and Aventura the power to enact red light

ordinances pursuant to the powers expressly granted to municipal governments

through section 316.008, Florida Statutes (2008), entitled "Powers of local

---

1.  Despite this subsequent express legislative statement of preemption, the issue in this case, involving ordinances passed prior to 2010, is by no means moot, particularly given the significant amounts of money that were collected by the cities of Orlando and Aventura pursuant to their then-existing municipal ordinances—which the majority has decided must now be returned to the individuals who violated these ordinances.

authorities." These powers, which included the authority to "[r]egulat[e], restrict[], or monitor[] traffic by security devices or personnel on public streets and highways," § 316.008(1)(w), Fla. Stat. (2008), clearly authorized municipal governments to enact the local legislation at issue here.

The majority's holding unnecessarily broadens this Court's interpretation of legislative preemption, while, at the same time, limiting the home rule authority granted to municipal governments by the Florida Constitution. I would quash the decision of the Fifth District Court of Appeal in City of Orlando v. Udowychenko, 98 So. 3d 589 (Fla. 5th DCA 2012), adopt the well-reasoned opinion of the Third District Court of Appeal in City of Aventura v. Masone, 89 So. 3d 233 (Fla. 3d DCA 2011), and hold that the red light camera ordinances enacted by the cities of Orlando and Aventura prior to 2010 were proper exercises of their municipal home rule authority.

The subject of this decision is a high profile and controversial one—the use of red light cameras by municipal governments to detect and sanction drivers that run red lights within their municipal boundaries as a complementary law enforcement tool to the mechanisms set forth in the Florida Uniform Traffic Control Law. Although this subject is of interest to many Floridians, the wisdom and public policy questions regarding the use of red light cameras are not before this Court, nor are any potential constitutional issues that may be implicated

- 14 -

through the use of these cameras. Instead, the only issue in this case is the purely legal question of whether municipalities were authorized to enact red light camera ordinances, which imposed municipal fines on drivers for conduct already covered by the Florida Uniform Traffic Control Law, prior to 2010, pursuant to their home rule authority.

The Florida Uniform Traffic Control Law provides a statutory framework that generally prohibits municipal governments from enacting local ordinances concerning topics already addressed by the Florida Uniform Traffic Control Law. However, the Florida Uniform Traffic Control Law also expressly authorizes municipalities to legislate within certain enumerated areas. In fact, as recognized by the majority, section 316.002, Florida Statutes, explicitly states that

> [t]he Legislature recognizes that there are conditions which require municipalities to pass certain other traffic ordinances in regulation of municipal traffic that are not required to regulate the movement of traffic outside of such municipalities. Section 316.008 enumerates the area within which municipalities may control certain traffic movement or parking in their respective jurisdictions. This section shall be supplemental to the other laws or ordinances of this chapter and not in conflict therewith.

§ 316.002, Fla. Stat. (2008).

Included within section 316.008 is subsection (1)(w), which grants municipal governments the power to "[r]egulat[e], restrict[], or monitor[] traffic by security devices or personnel on public streets and highways, whether by public or private parties and provid[e] for the construction and maintenance of such streets

- 15 -

and highways." § 316.008(1)(w), Fla. Stat. While the majority concludes that the municipal ordinances at issue here are not expressly authorized by this subsection, my review of chapter 316 and our precedent does not support the majority's interpretation. Rather than attempt to harmonize the ordinances in a way that does not conflict with the statutory scheme, the majority reads this authorizing section too narrowly.

When sections 316.002 and 316.008 are examined together, "the plain text of the Uniform Traffic Control Law expressly confers authority to a municipal government to regulate traffic within its municipal boundaries as a reasonable exercise of its police power where such regulation does not conflict, but supplements the laws found therein." City of Aventura, 89 So. 3d at 236. In my view, the use of red light cameras by municipalities to enforce red light infractions within their municipal boundaries is a regulation that falls squarely within the authority granted to municipal governments through section 316.008(1)(w). As articulated by the Third District, "[t]he City, via image capture technologies, monitors intersections it has determined to be of particular concern for traffic accidents, and regulates and restricts red light infractions at those intersections through the issuance of its notices of violation." Id. at 239.

I agree with the reasoning of the Third District, which explained that "[s]ection 316.008 allows the local authorities to use their home rule powers to

effectuate certain restrictions and regulations but does not specify the means or the schemes for implementing such restrictions or regulations." Id. at 240. By creating a system through which to impose penalties on drivers for running red lights, "the City has simply developed a procedure for carrying out its power to regulate, restrict or monitor traffic." Id.

Conversely, the majority concludes that section 316.008(1)(w) does not expressly authorize the municipal ordinances in this case because " '[r]egulating, restricting, or monitoring traffic by security devices' does not . . . explicitly provide authority for local governments to adopt measures for the punishment of conduct that is already subject to punishment under the framework established by chapters 316 and 318." Majority op. at 9 (quoting § 316.008(1)(w), Fla. Stat.). However, contrary to the majority's interpretation, this Court has previously interpreted the word "regulate," as found within the same section of the Florida Uniform Traffic Control Law, to encompass the power to impose punishment for the violation of municipal regulations within an area already addressed by the state.

In Thomas v. State, 614 So. 2d 468, 470 (Fla. 1993), this Court reviewed a municipal ordinance enacted pursuant to section 316.008(1)(h), which granted the municipality the power to "[r]egulat[e] the operation of bicycles," an area already covered by chapter 316. § 316.008(1)(h), Fla. Stat. (1989). Despite the fact that the Florida Uniform Traffic Control Law already regulated the operation of

- 17 -

bicycles, this Court concluded that, pursuant to the authority granted in section 316.008(1)(h), a municipal government had the power to enact an ordinance that imposed noncriminal penalties for violations of conduct within an area already regulated by the Florida Uniform Traffic Control Law, as long as the penalties imposed by the municipal ordinance did "not exceed the penalty imposed by the state." Thomas, 614 So. 2d at 470. By concluding in Thomas that municipal governments had the power to impose penalties pursuant to section 316.008(1)(h), this Court interpreted the word "regulate" in the Florida Uniform Traffic Control Law to encompass the power to impose fines for violations of municipal regulations within an area covered by chapter 316.

Based on an overly narrow reading of Thomas, the majority attempts to distinguish Thomas from this case on the basis that there was no existing state statute regulating the precise conduct addressed by the municipal ordinance—as is the case here. However, in Thomas, the absence of specific state regulation was inconsequential. In determining that the municipal government could impose non-criminal penalties for violations of conduct within an area covered by chapter 316, the Court did not rely on the absence of state regulation, but looked solely to whether the regulated conduct fell within one of the areas enumerated in section 316.008, within which municipalities are expressly authorized to act. See id. Here, just as in Thomas, the regulation undertaken by the municipalities falls

within an area enumerated in section 316.008. Id. Therefore, just as in Thomas, the municipal governments had the power to impose non-criminal penalties for violations of these regulations.

Although the majority states that its decision is premised solely upon express preemption, its reliance upon the fact that the municipalities created enforcement regimes different than those provided by state law seems to implicate conflict preemption—essentially concluding that the ordinances are invalid because they conflict with section 316.075(4), Florida Statutes, which states that red light violations are "punishable pursuant to chapter 318," § 316.075(4), Fla. Stat. (2008), as well as section 318.121, Florida Statutes, which states that "[n]otwithstanding any general or special law, or municipal or county ordinance, additional fees, fines, surcharges, or costs other than the court costs and surcharges assessed under s. 318.18(11), (13), and (18) may not be added to the civil traffic penalties assessed in this chapter." § 318.121, Fla. Stat. (2008). In addressing conflict preemption, the majority states that this concept "comes into play 'where the local enactment irreconcilably conflicts with or stands as an obstacle to the execution of the full purposes of the statute.' " Majority op. at 5 (quoting City of Palm Bay v. Wells Fargo Bank, N.A., 114 So. 3d 924, 928 (Fla. 2013)).

This standard, which originates from McQuillin's The Law of Municipal Corporations, a general treatise on the law of municipalities, is broader than the

conflict standard previously followed by this Court.  See 5 McQuillin Mun. Corp. § 15:16 (3d ed. 2012).  As articulated by this Court in Sarasota Alliance For Fair Elections, Inc. v. Browning, the "test of conflict between a local government enactment and state law is 'whether one must violate one provision in order to comply with the other.  Putting it another way, a conflict exists when two legislative enactments cannot co-exist.' "  28 So. 3d 880, 888 (Fla. 2010) (quoting Laborers' Int'l Union of N. Am., Local 478 v. Burroughs, 541 So. 2d 1160, 1161 (Fla. 1989)).

Nonetheless, even applying the broader standard for conflict preemption recently adopted by this Court in Palm Bay, a decision from which I also dissented, the municipal ordinances in this case still do not conflict with section 316.075(4), which states that red light violations are "punishable pursuant to chapter 318." § 316.075(4), Fla. Stat.  The plain text of the Florida Uniform Traffic Control Law expressly confers authority to a municipal government to regulate traffic within its municipal boundaries where such regulation "does not conflict, but supplements the laws found therein."  City of Aventura, 89 So. 3d at 236; see § 316.002, Fla. Stat. ("Section 316.008 enumerates the area within which municipalities may control certain traffic movement or parking in their respective jurisdictions.  This section shall be supplemental to the other laws or ordinances of this chapter and not in conflict therewith.").  Here, the enforcement mechanisms codified through

- 20 -

the city ordinances are completely consistent with and supplemental to those found within the Florida Uniform Traffic Control Law.

While I do not dispute that those red light violations prosecuted under the Florida Uniform Traffic Control Law must be punished "pursuant to chapter 318," as required by section 316.075, red light violations punished through the municipalities' code enforcement mechanisms are not subject to this same requirement. That is because these municipal ordinances exist independently of the Florida Uniform Traffic Control Law and represent supplemental enforcement mechanisms that have been expressly authorized by the Florida Uniform Traffic Control Law pursuant to section 316.008(1)(w). Simply because the ordinances regulate conduct that is also covered by the Florida Uniform Traffic Control Law does not automatically mean that the municipal ordinances "irreconcilably conflict[] with or stand[] as an obstacle to the execution of the full purposes of the statute." Majority op. at 5 (quoting City of Palm Bay, 114 So. 3d at 928).

In fact, it is clear that the two enforcement mechanisms can exist concurrently, as enforcing traffic violations under the municipal ordinances "does not prohibit law enforcement officers from issuing a citation in accordance with the Uniform Traffic Control Law," or in any way stand as an obstacle to the Florida Uniform Traffic Control Law. City of Aventura, 89 So. 3d at 238. Indeed, as stated by the Third District, the "[o]rdinance supplements law enforcement

personnel in the enforcement of red light infractions, by issuing a notice of violation under the City's Code of Ordinances, deemed a non-criminal, non-moving violation, for which a civil penalty shall be assessed." Id.

Additionally, it is equally apparent that municipal citations cannot be issued pursuant to the municipal ordinances for red light infractions for which a motorist receives a citation pursuant to the Florida Uniform Traffic Control Law. For example, the City of Aventura's ordinance specifically states that the ordinance does not apply to emergency vehicles or vehicles involved in collisions, and then also states "nor shall a notice be issued in any case where the operator of the vehicle was issued a citation for violating the state statute regarding the failure to stop at a red light indication for the same event or incident." Aventura, Fla., City Code, ch. 48, art. 3, § 48-38 (2007).

Thus, each regulatory system represents an independent mechanism to prevent red light violations, neither of which is implicated when the other is utilized. Because this Court has previously stated that "a conflict exists when two legislative enactments cannot co-exist," Browning, 28 So. 3d at 888 (quoting Burroughs, 541So. 2d at 1161), it is clear, in my opinion, that these two legislative enactments do not impermissibly conflict, as the municipal ordinances do not "supersede, infringe, curtail or impinge upon state or county laws" and are able to

coexist alongside the Florida Uniform Traffic Control Law. City of Aventura, 89 So. 3d at 238 (quoting Aventura, Fla., City Code, ch. 48, art. 3, § 48–26 (2007)).

Further, the municipal ordinances also do not conflict with section 318.121, which states that "additional fees, fines, surcharges, or costs . . . may not be added to the civil traffic penalties assessed in this chapter." Section 318.121 expressly preempts municipalities from undertaking very specific conduct—adding additional fines or costs on top of those assessed under chapter 318. For example, pursuant to section 318.121, a municipal government could not authorize a law enforcement officer to impose an additional municipal fine when issuing a traffic citation pursuant to the Florida Uniform Traffic Control Law for the same infraction. Similarly, a municipal government could not enact a local ordinance that imposes additional court costs or fees on top of those that are allowed under chapter 318 when adjudicating traffic citations issued pursuant to the Florida Uniform Traffic Control Law.

In this case, the municipal ordinances do not "add[] to the civil traffic penalties assessed" pursuant to chapter 318. § 318.121, Fla. Stat. Instead, the ordinances impose different fines, for the violation of separate municipal ordinances that exist alongside the Florida Uniform Traffic Control Law. Accordingly, the fines imposed by the municipal ordinances are not "additional" to the fines found in chapter 318, and section 318.121 is not in conflict with

municipal ordinances that assess penalties independent of those found within chapter 318.

Finally, the majority has, in my view, failed to take into account the breadth of the home rule authority granted to municipalities by both the Florida Constitution and by statute. In 1973, in order to clarify the breadth of the authority granted to municipalities in Florida, the Legislature enacted the Municipal Home Rule Powers Act, which was codified to "secure for municipalities the broad exercise of home rule powers granted by the constitution" and to "remove any limitations, judicially imposed or otherwise, on the exercise of home rule powers other than those so expressly prohibited." § 166.021(4), Fla. Stat. (2008). This Act made clear that the Florida Legislature intended for municipal governments to have the power to enact local legislation on the same subjects and to the same extent as the state government, except in narrow circumstances where the Legislature has preempted a specific area of law to the state or where the local law conflicts with state law.

Allowing municipalities to enact local traffic ordinances where they are "in a unique position to identify dangerous intersections within [their] boundaries and implement additional safeguards to prevent accidents at such intersections," is consistent with the purposes underlying Florida's decision to grant municipal governments extensive powers of self-governance. City of Aventura, 89 So. 3d at

237. Therefore, I cannot agree with the majority that section 316.008(1)(w), which expressly authorizes municipalities to "[r]egulat[e], restrict[], or monitor[] traffic by security devices or personnel on public streets and highways, whether by public or private parties," in a manner consistent with their broad home rule authority, did not expressly authorize municipal governments to use red light cameras to enforce red light infractions within their municipal boundaries, prior to the enactment of the Mark Wandall Traffic Safety Act in 2010.

For all these reasons, I respectfully dissent from the majority opinion. I would, instead, adopt the opinion of the Third District in <u>City of Aventura</u>, 89 So. 3d 233, and conclude that the ordinances enacted by the cities of Orlando and Aventura were proper exercises of the municipal governments' home rule authority.

QUINCE, J., concurs.

<u>Two Cases</u>
Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

      Third District – Case No. 3D10-1094

      (Miami - Dade County)

and

Application for Review of the Decision of the District Court of Appeal – Certified Direct Conflict of Decisions

Fifth District – Case No. 5D11-720

(Orange County)


Bret Lusskin of The Ticket Cricket, Hallandale, Florida; Bard D. Rockenbach and Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, Florida; David B. King, Thomas Zehnder, Vincent Falcone, III of King, Blackwell, Zehnder & Wermuth, P.A., Orlando, Florida,

> for Petitioners

Edward G. Guedes, Michael S. Popok, and John J. Quick of Weiss Serota Helfman Pastoriza Cole & Boniske, P.L., Coral Gables, Florida; and Jason D. Weisser and David Michael Kerner of Schuler Halvorson Weisser & Zoeller, P.A., West Palm Beach, Florida,

> for Respondents

Alan Rosenthal and Jack R. Reiter of Carlton Fields, P.A, Miami, Florida; Samuel J. Salario, Jr. and Joseph Hagedorn Lang, Jr. of Carlton Fields, P.A., Tampa, Florida; Nancy G. Linnan of Carlton Fields, P.A., Tallahassee, Florida; and Harry "Chip" Morrison, Jr. of the Florida League of Cities, Inc., Tallahassee, Florida,

> for Amici Curiae Florida League of Cities, Inc., American Traffic Solutions, Inc., and Xerox State & Local Solutions, Inc.

Erin J. O'Leary, Usher L. Brown, and Anthony Garganese of Brown, Garganese, Weiss & D'Agresta, P.A., Orlando, Florida,

> for Amici Curiae City of Casselberry, Florida, City of Palm Bay, Florida, and City of Palm Coast, Florida